IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Thomas O'Grady, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 3:08-2192-HMH-JRM |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court with the Report and Recommendation of United States Magistrate Judge Joseph R. McCrorey, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 of the District of South Carolina.[1] Thomas O'Grady ("O'Grady") seeks judicial review of the Commissioner of Social Security Administration's ("Commissioner") denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. In his Report and Recommendation, Magistrate Judge McCrorey recommends reversing the Commissioner's decision and remanding the case to the Commissioner for an award of benefits. The Commissioner objects to the Report and Recommendation. For the reasons stated below, the court the reverses the Commissioner's decision and remands the case for an award of benefits.

---

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. See 28 U.S.C. § 636(b)(1) (2006).

1

## I. Factual and Procedural Background

The facts are fully set forth in the initial decision of the administrative law judge ("ALJ"), (R. at 27-37), and summarized as follows. At the time of the ALJ's decision on April 28, 2005, O'Grady was a sixty-year-old male with a highschool education. (Id. at 22, 277.) O'Grady filed an application for DIB on October 30, 2002. (Id. at 80-83.) The ALJ found that the time period for disability was from December 15, 1997 through December 31, 2001 ("relevant time period"). (Id. at 313-14.) The application was denied initially and on reconsideration. (Id. at 24-25, 105-10.) After a hearing held on January 18, 2005, the ALJ issued a decision dated April 28, 2005, denying benefits. (R. at 27-37.) On January 31, 2006, the Appeals Council denied O'Grady's request for review, thereby making the determination of the ALJ the final decision of the Commissioner. (Id. at 7-9.)

O'Grady filed an action in this court on March 31, 2006, and this court reversed and remanded the case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings. Specifically, this court instructed the ALJ to properly consider O'Grady's treating physician's, Dr. Michael Gingras ("Dr. Gingras"), October 2003 opinion, determine O'Grady's residual functional capacity, and evaluate O'Grady's credibility. (May 16, 2007 Order, generally.) The Appeals Council remanded the case to the ALJ for further proceedings consistent with this court's May 16, 2007 Order. A supplemental hearing was held on December 11, 2007. (R. at 463-474.) The ALJ denied O'Grady's claim on February 14, 2008.

At the time of the ALJ's decision on remand, O'Grady was sixty-four years of age. His past relevant employment includes work as a sales representative. (Id. at 28.) O'Grady alleges that he has been disabled since December 15, 1997, due to organic brain syndrome ("OBS"),

2

depression, attention deficit disorder, a lumbar spine disorder, hypertension, reactive airway disease, and strokes. (Id. at 28, 85.)

O'Grady almost drowned in a scuba diving accident in July 1991. Because a cerebral gas embolism could not be ruled out, O'Grady was recompressed with adjunctive measures. (Id. at 117.) On April 2, 1994, O'Grady reported to Dr. Gingras, a psychiatrist, explaining that he was suffering from depression, anxiety, poor sleep, lack of concentration, dizziness, and panic. Dr. Gingras observed that O'Grady was tense, shaky, and unsure of himself, and that O'Grady's cognition was affected due to poor memory and concentration. Although O'Grady "presented himself well, responded to questions well and was cooperative," Dr. Gingras noted that all of O'Grady's "cognitative [sic] function appeared to be interfered with as concentration and memory was not very good." (Id. at 238.) Dr. Gingras diagnosed O'Grady with post-concussion syndrome and an adjustment disorder with mixed emotional features including generalized anxiety and panic and moderately-severe depression. (R. at 238.) Dr. Gingras prescribed Xanax for O'Grady.

On May 2, 1994, Dr. Gingras noted that O'Grady's condition remained the same and diagnosed him with OBS. (Id. at 235-36.) Dr. Gingras prescibed Zoloft for O'Grady on May 5, 1994. (Id. at 234.) Dr. Gingras noted some improvement in O'Grady's depression on May 12, 1994. (Id. at 233.) On June 29, 2004, Dr. Gingras noted that O'Grady was experiencing oversensitivity and anxiety. (Id. at 232.) At O'Grady's next appointment in August 1994, Dr. Gingras reported that O'Grady was doing well and that his assessment of him was the same. (R. at 231.) On September 19, 1994, Dr. Gingras reported that O'Grady was tense and had some difficulty sleeping and prescribed Zoloft, Ambien, and Xanax for him. (Id. at 230.) At a

November 1994 appointment with Dr. Gingras, O'Grady reported that he was terminated from his job and was struggling with issues related to a motor vehicle accident. (Id. at 229.)

On October 12, 1994, Dr. Robert Martinez ("Dr. Martinez"), a neurologist, examined O'Grady and noted that he had memory difficulties, trouble concentrating, a shortened attention span, and marked short-term memory loss because of the 1991 scuba diving accident. (Id. at 134.) O'Grady indicated that he was disoriented at times and that his intellectual ability had decreased. Based on his examination of O'Grady, Dr. Martinez noted that O'Grady

> is no longer as acute and astute as he used to be in his thinking processes. He just simply cannot concentrate anymore. His attention span is very short. He is very dull and slow. He has marked short-term memory loss, [and] trouble learning new things. He is a little bit disoriented at times.

(Id. at 135.) Dr. Martinez's impression was that O'Grady suffered from "chronic [OBS] secondary to hypoxic encephalopathy as a result of a near drowning episode" in 1991. (R. at 137.) Further, Dr. Martinez concluded that O'Grady had reached maximal medical improvement, that his OBS was permanent with a "22% permanent partial disability rating to the body as a whole," and that O'Grady would need long-term psychiatric care. (Id. at 137.)

O'Grady saw Dr. Gingras on January 17, 1995, July 12, 1995, August 25, 1995, and November 21, 1995. During this time, O'Grady reported increased stress and no energy. Further, in August 1995, Dr. Gingras noted that O'Grady was not tolerating his medications. Dr. Gingras prescribed Paxil. (Id. at 225-38.)

O'Grady continued to see Dr. Gingras throughout 1996. Dr. Gingras noted that O'Grady continued to suffer from stress and tension. In particular, O'Grady attempted to work in September 1996 and experienced increased stress and lack of sleep. (Id. at 221-22.) On December 23, 1996, Dr. Gingras noted that "to this date very little progress has been

4

accomplished since many of these symptoms are organically based and therefore possibly permanent. It is more than likely that his ability to perform on a cognitive level remains inadequate and will probably remain the same with a very poor prognosis." (Id. at 219.)

O'Grady suffered a back injury in a motor vehicle accident on June 19, 1996. On September 30, 1996, Dr. James Schwartz ("Dr. Schwartz"), an orthopaedist, diagnosed O'Grady with "severe degenerative disk disease at L5, S1, with apparently an extruded disk," a cervical strain, and mild degenerative disk disease. (R. at 138.) Dr. Schwartz recommended chiropractic treatment, anti-inflammatory medication, and muscle relaxers. Further, Dr. Schwartz told O'Grady to "hold off for at least another 60 days" before beginning a job that would require several hours a day of driving. (Id. at 139.)

On September 29, 1997, and December 10, 1997, Dr. Gingras reported that O'Grady was functioning well, but was under stress from his back injury and job. Dr. Gingras noted that his assessment of O'Grady remained the same. (Id. at 217-18.)

Dr. Richard McAdam ("Dr. McAdam"), a neurosurgeon, examined O'Grady on January 30, 1998, and noted that O'Grady's back pain made driving difficult. Dr. McAdam recommended epidural steroid injections for O'Grady's back pain. (Id. at 149-150.) O'Grady received steroid injections in January 1999, August 1999, and January 2000. (Id. at 140-42.)

O'Grady visited Dr. Gingras again on January 12, 1999, June 17, 1999, August 26, 1999, and November 18, 1999. During the January 1999 visit, Dr. Gingras found that O'Grady was "not capable of functioning in the job because of numerous family problems. The patient is reporting being depressed, feeling his medication is not working as well as it did before and having run out." (R. at 212.) However, Dr. Gingras noted that O'Grady was in a good mood and

highly motivated for treatment. In June, August, and November 1999, Dr. Gingras reported that O'Grady was functioning relatively well considering the amount of stress in his life. (Id. at 209-11.)

On March 1, 2000, Dr. McAdam noted that the injections had only provided temporary relief and on March 24, 2000, recommended that O'Grady continue with the injections and consider surgery if his pain continued. (Id. at 145.) A March 22, 2000 MRI revealed degenerative disk disease at L4-5 and L5-S1 and "an enlarged right lateral osteophyte at L5-S1, likely with an associated disk bulge." (Id. at 146-47.)

In January 2000, Dr. Gingras reported that O'Grady was functioning relatively well but was suffering from "mild cognitive impairment as evidenced by his inability to focus and retain short term memory content." (Id. at 208.) In March 2000, O'Grady reported that he had ceased taking Ambien and Xanax, but was taking Celexa and Ritalin. Dr. Gingras noted that O'Grady was functioning relatively well but his assessment was the same regarding OBS. (R. at 207.) Dr. Gingras's notes reveal that O'Grady's condition remained the same from 2000 to early 2002. (Id. at 206-208.) On May 29, 2002, Dr. Gingras noted that O'Grady was crying during the interview and reported that he was feeling depressed and suffering from cognitive issues. (Id. at 206.)

Another psychiatrist, Dr. Joseph Cockrell ("Dr. Cockrell"), examined O'Grady on March 5, 2001, for O'Grady's depression and excessive irritability. (Id. at 170.) Dr. Cockrell prescribed Effexor. On April 5, 2001, Dr. Cockrell noted that Effexor was not helping, and he switched O'Grady to Wellbutrin. (Id. at 169.) O'Grady reported improvement in his mood and energy. Dr. Cockrell noted that O'Grady's improvement might be due to "a cycling mood

condition, such as bipolar disorder" because "it seems unlikely that Wellbutrin by itself would suddenly cure so many symptoms . . . ." (R. at 169)  A May 7, 2002 CAT scan revealed "two left cerebellar hemisphere lesions consistent with old infarcts." (Id. at 153.)

In July 2003, O'Grady considered electroconvulsive therapy but was afraid of following through with treatment. (Id. at 186, 189.)  On January 24, 2003, a state agency physician reviewed O'Grady's medical records and concluded that

> as of December 31, 2001, O'Grady retained the physical residual functional capacity to lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit six hours in an eight-hour workday; perform limited lower extremity pushing and/or pulling; climb ramps and stairs; balance, stoop, kneel, crouch, and crawl frequently; perform work not requiring climbing ladders, ropes, and scaffolds; and perform work not requiring concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  The physician noted no manipulative, visual, communicative, or other environmental limitations.

(Id. at 154-63.)

On October 23, 2003, Dr. Gingras completed a Mental Impairments Questionnaire ("October 2003 opinion"). (Id. at 199-204.)  In the questionnaire, Dr. Gingras indicated that O'Grady had a reduced IQ and was unable to maintain an acceptable degree of functioning. (R. at 202.)  Further, Dr. Gingras found that O'Grady's ability to understand, remember, and follow simple instructions; make simple work-related decisions; accept instructions; and respond appropriately to supervisors was limited, but satisfactory. (Id. at 201.)  Dr. Gingras opined that O'Grady was unable to understand and remember detailed instructions. (Id. at 202.)  Dr. Gingras also noted that O'Grady suffered from marked limitations in maintaining social functioning, concentration, persistence, or pace. (Id. at 203.)  Dr. Gingras indicated that O'Grady experienced four or more "repeated episodes of decompensation within a twelve month period, each of at

7

least two weeks in duration." (Id. at 203.) Dr. Gingras concluded that O'Grady's condition was organically based and that no improvement could be expected. (R. at 203) On February 2, 2004, Dr. Gingras noted that O'Grady continued to suffer from decreased focus and organizational skills. (Id. at 198.)

O'Grady filed the instant action on June 11, 2008, alleging that the ALJ erred by failing to (1) consider O'Grady's OBS diagnosis and (2) properly consider the combined effect of all of his impairments. (Pl. Mem. Supp. J. 7-11.)

## II. Report and Recommendation

The magistrate judge recommends reversing the Commissioner's decision and remanding for an award of benefits. (Report & Recommendation 17.) The magistrate judge states that the ALJ erred (1) because his "determination that O'Grady's impairment of OBS was non-severe is not supported by substantial evidence;" (2) his "decision to not give controlling weight to Dr. Gingras's October 2003 opinion is not supported by substantial evidence;" and (3) because his evaluation of O'Grady's credibility is not supported by substantial evidence.[2] (Id. at 12-17.)

## III. Discussion of the Law

### A. Standard of Review

Under 42 U.S.C. § 405(g), the court may only review whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). In other words, the court "must uphold the

---

[2] O'Grady does not specifically allege that the ALJ erred in evaluating his credibility. Accordingly, this Order will only address the issues raised in O'Grady's memorandum.

factual findings of the Secretary [only] if they are supported by substantial evidence *and* were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (emphasis added).

"Substantial evidence" is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (internal quotation marks omitted). Hence, if the Commissioner's finding is supported by substantial evidence, the court should uphold the finding even if the court disagrees with it. See id. However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

It is "appropriate to reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." Breeden v. Weinberger, 493 F.2d 1002, 1012 (4th Cir. 1974).

### B. Objections

The Commissioner filed objections to the magistrate judge's Report. First, the Commissioner argues that the magistrate judge erred in finding that the ALJ's determination that O'Grady's OBS was non-severe was not supported by substantial evidence. Additionally, the Commissioner asserts that "even assuming arguendo that the ALJ erred in neglecting to find [O'Grady's] OBS 'severe' . . . any error was harmless." (Objections 1.)

Step two of the five-step sequential evaluation process requires the ALJ to "consider the medical severity of [a claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). A severe

impairment or combination of impairments "significantly limits [a claimant's] physical or mental ability to do basic work activities." § 404.1520(c). Basic work activities are defined as:

> the abilities and aptitudes necessary to do most jobs. Examples of these include--
>
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

O'Grady was diagnosed with OBS by Dr. Gingras on May 2, 1994. (R. at 236.) On October 12, 1994, Dr. Martinez diagnosed O'Grady with chronic OBS secondary to hypoxic encephalopathy, recommending that O'Grady "continue psychological psychiatric care on a long-term basis," and that O'Grady had "reached maximum medical improvement." (Id. at 137.) Dr. Martinez also noted that O'Grady's injury was "permanent . . . with a 22% permanent partial disability rating to the body as a whole from the [OBS]." (Id.) Both Drs. Gingras and Martinez noted O'Grady's cognitive inabilities, stating that he experienced problems concentrating and difficulties with his memory. (Id. 134, 238.)

Additionally, Dr. Gingras's October 2003 report noted that O'Grady had a reduced IQ and was "unable to maintain an intellectually acceptable degree of functioning." (Id. at 202.)

Dr. Gingras found that O'Grady's ability to understand, remember, and carry out simple instructions; make simple work-related decisions; accept instructions; and respond appropriately to supervisors was limited, but satisfactory. (R. at 201.) However, Dr. Gingras opined that O'Grady was unable to follow detailed instructions. Dr. Gingras also noted that O'Grady suffered from marked limitations in maintaining social functioning, concentration, persistence, and pace. (Id. at 203.) Dr. Gingras indicated that O'Grady had four or more periods of "repeated episodes of decompensation within a twelve month period, each of at least two weeks in duration." (Id.) Dr. Gingras concluded that O'Grady's condition was organically based and that no improvement could be expected. (Id.) As this court noted in its May 16, 2007 Order, many of O'Grady's problems relate to his OBS. However, the ALJ failed to discuss whether the OBS, alone or in combination with other impairments, resulted in any functional or mental limitations.

"[I]n evaluating the effect of various impairments upon a disability benefit claimant, the [ALJ] must consider the combined effect of a claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id. Here, the ALJ not only failed to discuss the limitations imposed as a result of OBS, he also failed to consider those impairments in combination with O'Grady's other impairments. The court finds that the ALJ's failure to discuss O'Grady's OBS, alone or in combination with other impairments, is based, in part, upon the ALJ's failure to give controlling weight to Dr. Gingras's medical opinions. As discussed below, the ALJ's decision not to give Dr. Gingras's medical opinions controlling weight is not supported by the substantial weight of the evidence in the record.

Next, the Commissioner objects to the magistrate judge's finding that the ALJ's decision not to give Dr. Gingras's October 2003 opinion controlling weight is not supported by substantial evidence. (Objections 3.) The Commissioner argues that "Dr. Gingras' October 2003 opinion . . . was completed well past the December 31, 2001 expiration of [O'Grady's] insured status" and is "irrelevant to [O'Grady's] condition during the relevant time period." (Id.) The Commissioner articulated this argument in his objections in the previous proceeding with this court and the court found that the argument was without merit. As this court stated in its May 16, 2007 Order, "Dr. Gingras's October 2003 report is relevant to evaluating O'Grady's condition" during the relevant time period. (May 16, 2007 Order at 9.) Furthermore, Dr. Gingras's medical opinions and diagnoses as a whole are relevant in determining O'Grady's capabilities during the relevant time period.

The ALJ must afford controlling weight to a treating physician's opinion if it is not inconsistent with substantial evidence in the record and is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(d)(2) (2006). "When the treating source has seen [a claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than [he] would give it if it were from a nontreating source." § 404.1527(d)(2)(i).

Dr. Gingras has served as O'Grady's treating physician since April 2, 1994. Dr. Gingras diagnosed O'Grady with OBS in May 1994 and has continued to treat O'Grady before, during, and after the relevant time period. Accordingly, Dr. Gingras's medical analysis of O'Grady's

mental condition sheds light on O'Grady's capabilities during the relevant time period, especially considering the permanent nature of O'Grady's OBS. (R. at 219, 137.) Moreover, Dr. Gingras's findings are consistent with neurologist Dr. Martinez's findings and diagnosis of "chronic OBS" made in October 1994. (Id. at 134-37.) Both doctors have described the long-lasting effects of O'Grady's OBS. (Id. at 137, 219.)

In the October 2003 opinion, Dr. Gingras concluded that O'Grady was unable to "remember work-like procedures," "maintain attention for two hour segments," "complete a normal workday and workweek without interruption from psychologically based symptoms" or "deal with normal work stress." (Id. at 201.) When questioned about how often he would anticipate that O'Grady's impairments or treatments would cause O'Grady to be absent from work, Dr. Gingras explained that O'Grady's condition is organically based and there is no improvement expected. (Id. at 203.) This opinion is consistent with Dr. Martinez's assessment that O'Grady's impairment is permanent and requires long-term psychiatric care. (R. at 137.)

Dr. Gingras's 2003 opinion is also consistent with his prior medical notes dating back to 1994. On December 23, 1996, Dr. Gingras noted that O'Grady had shown little progress and that it was likely that O'Grady's cognitive ability would remain inadequate with similar poor prognosis in the future due to the organic nature of OBS. (Id. at 219.) During O'Grady's visits in September and December of 1997, Dr. Gingras's assessment of O'Grady's OBS remained the same. (Id. at 217-218.) In January 2000, Dr. Gingras reported that O'Grady suffered from mild cognitive impairment and was unable to focus and retain short-term memory content. (Id. at 208.) Dr. Gingras's assessment of the effects of OBS did not change in 2001 or 2002, despite the fact that O'Grady was reported to be in a good mood with high morale. (Id. at 206-208.)

On remand, the ALJ was instructed to properly consider Dr. Gingras's October 2003 opinion in light of the evidence provided by Drs. Gingras and Martinez regarding OBS. The ALJ made the following conclusions on remand:

> I have considered the mental impairment questionnaire completed by Dr. Gingras on October 24, 2003, in which he indicated that the claimant was unable to intellectually maintain [an] acceptable degree of function . . . . Dr. Gingras' opinion of October 2003 was made almost 2 years after the expiration of [O'Grady's] insured status and it appears that he had not seen [O'Grady] since February 2002 . . . . I find that Dr. Gingras' treatment notes fail to show significant mental problems for the period prior to the date last insured, December 31, 2001. . . . I do not give his opinion that [O'Grady] was unable to maintain an acceptable degree of function controlling weight because it is contradicted by his own treatment notes. I note that he reported that [O'Grady] was doing well, was articulate, intelligent, and in a good mood on many office visits. Dr. Gingras' last treatment notes in December 2000 and February 2002 show that [O'Grady] was doing well. He described [O'Grady] as having a mild cognitive impairment in January 2000, and [O'Grady] told him that he was looking for a decent job.

(R. at 320-21.) The court finds that the ALJ's conclusion is not supported by substantial evidence in the record. First, "[o]bjective medical facts and the opinions and diagnoses of the treating and examining doctors constitute a major part of the proof to be considered in a disability case and may not be discounted by the ALJ." McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ's conclusion that Dr. Gingras's notes have failed to show significant mental problems is not supported by the evidence in the record discussed in part above. Second, it appears that the ALJ considered Dr. Gingras's references that O'Grady was doing well, but failed to consider Dr. Gingras's repeated assessment that O'Grady's condition remained the same and that O'Grady experienced varying problems throughout the relevant time period, which required numerous medication adjustments. Additionally, the ALJ's reliance on O'Grady's reported "good mood" is misplaced. While O'Grady may have been reported to be in good

spirits during some of his evaluations, Dr. Gingras's medical assessment that O'Grady continued to suffer from cognitive impairments that resulted from OBS never changed.

Based on the foregoing, the court finds that the ALJ's failure to give controlling weight to Dr. Gingras's medical opinion is not supported by substantial evidence and warrants reversing the Commissioner's decision and remanding the case to the Commissioner for an award of benefits. The record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and reopening the record for more evidence would serve no purpose.

Therefore, it is

**ORDERED** that the Commissioner's decision is reversed and the case is remanded for an award of disability insurance benefits.

**IT IS SO ORDERED**.

                                                s/Henry M. Herlong, Jr.
                                                Senior United States District Judge

Greenville, South Carolina
August 17, 2009